Mr. Justice GRIER.
I concur in the opinion delivered by Mr. Justice Nelson on the questions discussed by him.
I also concur with the opinion of the court as delivered by the Chief Justice, that thé act of Congress of 6th March, 1820, is unconstitutional and void; and that, assuming the facts as stated in the opinion, the plaintiff cannot sue as a citizen of Missouri in the courts of the United States. But, that the record shows a prima facie case of jurisdiction, requiring the court to decide all the questions properly arising in it; and as the decision of the pleas in bar shows that the plaintiff is a slave, and therefore not entitled to sue in a court of the United States, the form of the judgment is. of little importance; for, whether the judgment be affirmed or dismissed for want of jurisdiction, it is justified- by the decision of the court, and is the same in effect between the parties to the suit.
Mr. Justice DANIEL.
It may with truth be affirmed, that since the establishment of the several communities now constituting the States of this Confederacy, there never has been submitted to any tribunal within its limits questions surpassing in importance those now claiming the consideration of this court. Indeed it is difficult, to imagine, in connection with th¿ systems of polity peculiar to th,e United States,-a conjuncture of graver import than that must be, within which it is aimed to comprise, and to control, not only the .faculties and practical operation appropriate to the American Confederacy as such, but also the rights and •powers of its separate and independent members, with reference alike to their internal and domestic authority and inter- . ests, and the relations they sustain to their confederates.
To my mind it is evident,, that nothing less than the ambitious and far-reaching pretensionJ;o compass these objects of vital concern, is either directly essayed or necessarily implied in the positions attempted in the argument for the plaintiff in' error.
How far these positions have any foundation in the nature ' of the rights and relations of separate, equal, and independent Governments," or in the provisions of oúr own Federal compact, or the laws enacted under and in pursuance of the authority of that compact, will be presently investigated.
In order correctly to comprehend the tendency and force of those positions, it is proper here succinctly to advert to the *470 facts upon which'the questions of law propounded in the argument have; arisen.
This was. an action of trespass'^" et armis, instituted in the Circuit Court of the United States for the district of Missouri, in the name of the plaintiff in error, a negro held as a. slave, for the recovery of freedom for himself, his wife, and two children■, also negroes.
To the declaration in this case the defendant below, who-is also the defendant in error, pleaded in abatement that the court could not take cognizance of the cause, because the plaintiff" was not a citizen of the State of Missouri, as averred in the declaration, but was a negro of African descent, and that his ancestors, were of pure African blood, and were brought into this country and sold as negro slaves; and hence it followed, from the sécond section of the third article of the Constitution, which creates the judicial power of the United States, with respect to controversies between citizens of different States, that the Circuit Court could not take cognizance of the action:
To this plea in abatement, a demurrer having been interposed on behalf of the plaintiff, it was sustained by the court. After the decision sustaining the demurrer, the defendant, in pursuance, of a previous agreement between counsel, and with the leave of the court, pleaded in bar of the action:' lsi, not guilty; Idly, that the plaintiff was a negro slave, the lawful property of the defendant, and as such the defendant gently laid his hands upon him, and thereby had only restrained him, as the defendant had a right to do; 3dly, that with respect to the wife and/ daughters of the plaintiff, in the second and third counts of the declaration mentioned, the defendant had, as to them., only acted in the same manner, and in virtue of the same legal right.
Issues having been joined upon the above pleas in bar, the following statement, comprising all the evidence in the cause, was agreed upon and signed by the counsel of the respective parties, viz:
“In the year 1884, the plaintiff was a negro slave belonging to Doctor Emerson, who was a surgeon in the army of the United States. In that year, 1834, said Dr. Emerson took the Ílaintiff from the State of Missouri to the military post at lock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1886. At the time last mentioned, said Dr. Emerson removéd the plaintiff from said military post at Rock Island to the military post at Fort Snel-ling, situate on the west bank of the Mississippi river, in the Territory known as Upper Louisiana, acquired by the United States of France* and situate north of the latitude of thirty-six *471 degrees thirty minutes north, and north of the State of Missouri. Said Dr. Emerson held the plaintiff in slavery at said Eort Snelling, from said last-mentioned date until the year: 1838.
“In the year 1835, Harriet, who is named in the second count of the plaintiff's declaration, was the negro slave of Major Taliaferro, who belonged to the army of the TThited States. In that year, 1835, said Major Taliaferro took said Harriet to said Fort Snelling, a military post situated as herein-before stated, and kept her there as a slave until the year 1836, and then sold and delivered her as a slave at said Fort Snel-ling unto the said Dr. Emerson, hereinbefore named. Said Dr. Emerson held said Harriet in slavery at said Fort Snelling until the year 1838.
“In the year 1836, the- plaintiff and said Harriet, at said' Fort Snelling, with the consent of said Dr. Emerson, who then claimed to be their master and owner, intermarried, and took each other for husband and wife. Eliza and Lizzie, named in the .third count of the plaintiff’s declaration, are the fruit of that marriage. Eliza is about fourteen years old, ánd was born on board the steamboat Gipsey, north of the north line of the State of Missouri, and upon the river Mississippi. Lizzie is about seven years old, and was born in the State of Missouri, at a military post called Jefferson barracks.
“ In the year 1838, said Dr. Emerson removed the plaintiff and said Harriet, and their said daughter Eliza, from said Fort Snelling to the State of Missouri, where they have ever since resided.
“Before the commencement of this suit, said Dr. Emerson sold and conveyed the plaintiff, said Harriet, Eliza, and Lizzie, to the defendant, as slaves, and the defendant has ever since claimed to hold them and each of them as slaves. ,
. “At the times mentioned in the plaintiff’s declaration, the defendant, claiming to be owner as aforesaid, laid his hands upon said plaintiff j Harriet, Eliza, and Lizzie, and imprisoned them, doing in this respect, however, no more than what he might lawfully do if they were of right his slaves at such times.
“Further proof may be given on the trial for either party.
“R. M. Field, for Plaintiff.,
“H. A. GARLAND, for Defendant.
“It is agreed that Dred Scott brought suit for his freedom in the Circuit Court of St. Louis county; that there was a verdict and judgment in his favor; that on a writ of error to the Supreme Court, the judgment below was reversed, and the *472 "cause remanded to the Circuit Court, where it . has been continued to await the decision of this case.
“Field, for Plaintiff.
“ Garland, for Defendant.”
■ Upon the aforegoing agreed facts,- the plaintiff prayed the court to instruct the jury that they ought to find for the plaintiff, ana upon the refusal of the instruction thus prayed for, the plaintiff excepted to the court’s opinion. The court then, upon the prayer of the defendant, instructed the 'jury, that upon the facts of this cáse agreed as above, the law was with the defendant. To this opinion, also,, the plaintiff’s counsel excepted, as-he did to the opinion of the court denying to the plaintiff a- new trial after the verdict of the jury in favor of the defendant.
' The question first in or,der presented by the record in this cause, is that which arises upon the plea in abatement, and the demurrer to that plea;. and upon this question it is my opinion that the demurrer should have been overruled, and the plea sustained.
■ On behalf of the plaintiff it-has been urged, that by the pleas interposed'in bar of a recovery in the court below, (which pleas both in fact and in. law aré essentially the same With the objections averred in abatement,) the defence in abatement has been displaced or waived; that it eould therefore no longer be relied on in the Circuit Court,'' and cannot claim the consideration of this court in reviewing this cause.. This position is regarded as wholly untenable. On the contrary, it would seem to follow conclusively from the peculiar character of the courts of the United States, as organized under the Constitution and the statutes, and as defined by numerous and unvarying adjudications from'this bench, that-there is not one of those courts whose jurisdiction and powers can be deduced from mere custom or tradition; not one, whose jurisdiction and powers must not be traced palpably to, and invested exclusively by, the Constitution and statutes of the United States; not one' that is not bound, therefore, at all timés, and at all stages of its pro- . ceedings, to look to and -to i-egard, the special and declared extent and bounds of its commission and authority. There is no such tribunal of the United States as a court of ‘general jurisdiction, in the sense in which that phrase is applied to the superior courts under the- eommon law; and even with respect to the courts existing under that system, it is a well-settled principle, that consent can never give jurisdiction.
.. The principles above , stated, and the .consequences regularly deducíale from them,-have,, as already remarked, been repeat *473 edly and unvaryingly propounded from this bench. Beginning with the earliest decisions of this court, we have the cases of Bingham v. Cabot et al., (3 Dallas, 382;) Turner v. Eurille, (4 Dallas, 7;) Abercrombie v. Dupuis et al., (1 Cranch, 343;) Wood v. Wagnon, (2 Cranch, 9;) The United States v. The brig Union et al., (4 Cranch, 216;) Sullivan v. The Fulton Steamboat Company, (6 Wheaton, 450;) Mollan et al. v. Torrence, (9 Wheaton, 537;) Brown v. Keene, (8 Peters, 112,) and Jackson v. Ashton, (8 Peters, 148;) ruling, in unifprm and unbroken current, the doctrine that it is essential to the jurisdiction of the courts of the United States, that the facts upon which it is founded should appear upon the record. Nay, to such an extent and so inflexibly has this requisite to the jurisdiction been enforced, that in the case of Capron v. Van Noorden, (2 Cranch, 126,) it is declared, that the plaintiff in this court may assign for error his own omission in the pleadings in the court below, where they go to the jurisdiction. This doctrine has been, if possible, more strikingly illustrated in a later decision, the case of The State of Rhode Island v. The State of Massachusetts, in the 12th of Peters.
In this case, on page 718 of the volume, this court, .with reference to a motion to dismiss the cause for want of jurisdiction, have said: “However late this objection has been made, .or may be made, in any, cause in an inferior or appellate court of the United States, it must be considered and decided before, any court can move one farther step in the cause, as any movement is necessarily to exercise the jurisdiction. Jurisdiction is the power to hear and determine the subject-matter in controversy between 'the parties to a suit; to adjudicate or exercise any judicial power over them. The question is, whether on the case before the court their action is judicial or extra-judicial; with or without the authority of law to render a judgment or decree upon the rights-of the litigant parties. A motion to dismiss a-cause pending in the courts of the United States, is not analogous to a plea to the jurisdiction of a court of common law or. equity in England; there, the superior courts have a general jurisdiction over all persons within the realm, and all causes of action between them. It depends on the subject-matter, whether the jurisdiction shall be exercised by a court of law or equity ; but that court to which it appropriately belongs can act judicially upon the party and the subject of the suit, unless it shall be made apparent to the court that the judicial determination of the- case has been withdrawn- from the court .of general jurisdiction to an inferior and limited one. It is a necessary presumption that the court of general jurisdiction can act upon the given case, when nothing to the *474 contrary appears; hence has arisen the rule that the party claiming ah exemption from its process must set out the reason by a special.plea in abatement, and show that some inferior court of law or equity has the .exclusive cognizance of the case, otherwise the superior court must proceed in virtue .of its general jurisdiction. ■ A motion to dismiss, therefore, cannot be entertained, as it does not disclose a case of exception; and if a plea in abatement is put in, it must not only make out the exception, but point to the particular court to which the case belongs. There are other classes of cases where the objection to the jurisdiction is of a different nature, as on á bill in chancery, that the subject-matter is cognizable only by the King in Council, or that the parties defendant cannot be 'brought before any municipal court on account of their sovereign character or the nature of the controversy; or to the very common .cases which present the question, whether the cause belong /to a court of law or equity. . To such cases, a plea in abatement would not be applicable, because the plaintiff could not sue An ah inferior court. The objection goes to a denial of any jurisdiction of a municipal court in the one class of cases, and to the jurisdiction of any court of equity or. of law in the other, on which last the court decides according to its discretion.
“Ail objection,to jurisdiction on the ground of exemption from the process of ..the court in which the suit is brought, or the manner in which a defendant is brought -into it, is waived by appearance and pleading to issue; but when the objection goes to the power of the court over the parties or the subject-matter, the defendant need not, for he cannot, give the plaintiff . a better writ. Where an inferior court can have no jurisdiction of á case of law or equity, the ground of objection is not taken by plea in abatement, as an exception of the given casé .from ■ the otherwise general jurisdiction of the court; appearance 1 does not cure the defect of judicial power, and it may be relied on by plea, answer, demurrer, or at the. trial or hearing. As a denial of jurisdiction over the subject-matter ,of a suit between parties within the realm, over which and whom the court has power to act, cannot be successful in an English court.of general jurisdiction, a motion like the present could not bp sustained consistently with the principles of its constitution. But as this court is one of limited and'special original jurisdiction, its action must he confined to the particular cases, controversies, and parties, over which the Constitution and laws have authorized it to act; any proceeding without the limits prescribed is coram non judice,. and its action a nullity. And whether the want or excess of power is objected by a party, or is apparent *475 to the court, it must surcease its action or proceed extra-judi-cialiy.”
In the constructing of pleadings either in1 abatement or in' bar, every fact or position constituting a portion of the public law, or of known or general history, is necessarily implied. Such fact or position need not be specially averred and set forth; it is what the world at large and every individual are presumed to know — nay, are bound to know and to be governed by.
If, on the other hand, there exist facts or circumstances by which a particular case would' be withdrawn or exempted from the influence of public law or necessary historical knowledge, such facts and circumstances form an. exception to the general principle, and these must be specially set forth and established by those who would avail themselves of such exception.
blow, the following are truths which a knowledge of the history of the world, and particularly of that of our own country, compels us to know — that the African negro race never have been acknowledged as belonging to the family of nations; that as amongst them there never has been known or recog-nised by the inhabitants of other countries anything partaking of the character of nationality, of civil or political polity; that this race has been by all the nations of Europe regarded as subjects of capture or purchase; as subjects of éommeree or traffic;. and that the introduction of that race into every section of this country was not as members of civil, or political society, but as slaves, as property in the strictest sense of the term.
Tn the plea in abatement, the character or capacity of citizen on the part of the plaintiff is denied; and the causes which show the absence of that character or capacity áre set forth by averment. The verity of those causes, according to the settled rules of pleading, being admitted by the demurrer; it only remained for the Circuit Court to decide upon their legal sufficiency to abate the plaintiff’s action. And it now becomes the province of this court to determine whether the plaintiff below, (and in error here,) admitted to be a negro of African descent, whose anéestors were of pure African blood, and were brought into this country and sold as negro slaves — such being his' status, and such the circumstances surrounding his position; — whether he can, by correct legal induction from that status and those circumstances, be clothed with the character and capacities of a citizen of the State of Missouri?
It may be assumed-ás a postulate, that to a slave, as such, there appertains and can appertain no relation, ciyil or political, with the State or the Government. He is himself strictly property, to be used in subserviency to the interests, the con *476 venience, or the will, of his owner; and to suppose, with respect to the former, the' existence of any privilege or discretion, or of any obligation to others incompatible with the magisterial rights just defined, would be by implication, if not directly, to deny the relation of master and slave, since none can possess and enjoy, as his own, that which another has a paramount right and power to withhold. Hence it follows, necessarily, that a slave, the peculium or property of a master, and possessing within himself no civil nor political rights or capacities, cannot be a citizen. For who, it may be asked, is a citizen ? What do the character and status of citizen import ? "Without fear of contradiction, it does not import the condition of being private property,'the subject of individual power and ownership. Upon a principle of etymology alone, .the term citizen, as derived from civitas, conveys the ideas of connection or identification with "the State or Government, and a participation of its functions. But beyond this, there is not, it is believed, ,to be found, in the theories of writers- on Government, or in’ any actual experiment heretofore tried, an exposition of .the term citizen, which has not. been understood as conferring the actual possession and enjoyment, or the perfect right of acquisition and enjoyment, of an entire equality of privileges, civil and political.
Thus Vattel, in the preliminary chapter to his Treatise on the Law of Rations,, says': “Rations or States are bodies politic ; societies of men united together for the purpose of promoting their mutual safety and advantage, by the joint efforts of their mutual strength. Such a'society has her affairs and her interests; she deliberates and-takes resolutions in common; thus becoming a moral person, who possesses an understanding and a.will peculiar, to herself.” Again, in the first chapter of the first book of the Treatise just - quoted, the same writer, after repeating hi.s. definition .of. a State,' proceeds to remark, that, “from /the. very Resign that- induces a number of men to'form a-society, which has its common interests and which is -to act in/.concert, it is necessary that there should, -be' established a public authority, to order and direct what is to be done by each, iji relation to the end of the association. This political authority is/the sovereignty.” -Again this writer remarks; “The authority of all over each member essentially belongs to the body politic pr the State.”
By this same writer it is also said: “ The citizens are the members of the civil society; bound to this society by certain ■duties, and subject to its authority; they 'equally participate in its advantages. The natives, or natural-born citizéns, are those born in the country, of parents who -are citizens. As so- *477 eiety cannot perpetuate itself otherwise than hy the children of the citizens, those children naturally follow the condition of their parents, and succeed to all' their rights.” Again: “I say, to be of the country, it is necessary to' be born of a person who is a citizen; for if he be born there of a foreigner, it will be only the place of his birth, and not his country. The inhabitants, as distinguished from citizens, are foreigners who are permitted to settle and stay in the country.” (Vattel, Book 1, cap. 19, p. 101.)
From the views here expressed, and they seem to be unexceptionable, it must follow, that with the slave, with one devoid of rights or capacities, civil or political, there could be no pact; that one thus situated could be no party to, or actor in, the association of those possessing free will, power, discretion. He could form no part of the design, no constituent ingredient or portion of a society based upon common, that is, upon equal interests, and powers. He could not at the same time be the sovereign and the slave.
But it has been insisted, in argument, that the emancipation of a slave, effected either by the direct act and assent of the master, or by causes operating in contravention ■ of his will, produces a change in the status or capacities of the slave, such as will transform him from a mere subject of property, into a being possessing a social, civil, and political equality with a citizen.. In other words, will make him a citizen of the State within which he was, previously to his emancipation, a slave.
It is difficult to conceive by what magic the mere surcease or renunciation of an interest in a subject of property, by an individual possessing that interest, can alter the essential character of that property with respect to persons or communities unconnected with such renunciation. Can it be pretended that an individual in any State, by his single act, though voluntarily or designedly performed, yet without the co-operation or warrant of the Government, perhaps in opposition to its policy or its guaranties,' can create a citizen, of that State? Much more emphatically may it be asked, how such a result could be accomplished by means wholly extraneous, and entirely foreign to the Government of the State ? The argument thus urged must lead to these - extraordinary conclusions. It is regarded at once as wholly untenable, and as unsustained by the direct authority or by the analogies of history.
The institution of slavery, as it exists and has existed from the period of its introduction into the United States, though more humane and mitigated in character than was the same institution, either under the republic or the empire of Rome, bears, both in its tenure and in the simplicity incident to the *478 mode of its exercise, a closer resemblance to Roman slavery than it does to the condition of villanage, as it formerly existed in England. Connected with the latter, there were peculiarities, from custom or positive regulation, which varied it materially frorq the slavery pf the Romans, or from slavery at any period within the United States.
But with regard to slavery amongst the Romans, it is by no means true .that ¿mancipation, either during the republic or the empire, conferred, by the act itself, or implied, the status or the rights of citizenship.
_ _ The proud title of Roman citizen, with the immunities and rights incident thereto, and as contradistinguished alike from the condition of conquered subjects or of the lower grades of native domestic residents, was-maintained throughout the duration of the. republic, and until a late period of the eastern empire, and at last was in effect destroyed less by an elevation of the inferior classes than by the degradation of the free,, and the previous possessors of, rights and immunities civil and political, to the indiscriminate abasement incident to absolute and simple despotism; .
By the léarned and elegant historian of the Decline and Fall of the Roman Empire, we are told that' “In the decline of the Roman empire, the proud distinctions of the republic were gradually .abolished; and the reason or instinct of Justinian completed the .simple form of an absolute monarchy. The’ emperor could not eradicate the popular reverence which always waits on the possession of hereditary wealth or the •memory of famous ancestors. He delighted to honor with titles and- emolument's his generals, magistrates, and senators, and his precarious indulgence communicated some rays of their glory to tjieif wives and children. But in the eye of the law all Roman citizens were equal, and all subjects of the empire were citizens of Rome. That inestimable character was degraded to an obsolete and empty name. ■ The voice of -a Roman could no longer enact his laws, or create the annual ministers of his powers; his constitutional rights might have checked the arbitrary-will of a master; and the bold adventurer. from Germany or Arabia was admitted with equal favor to the civil and military command .which the citizen alone had been once entitled to assume over the conquests of his fathers. The first Csesars'had scrupulously guarded-the distinction of ingenuous and servile birth, which was decided by the condition of the mother. The slaves who were liberated by a generous master immediately entered into the middle class of Iweriini or freedmen; but they could never be enfranchised from the duties of. obedience and gratitude; whatever were the fruits of *479 their industry, their patron and his family inherited the third part, or even the whole of their fortune, if they died without children and without a testament. Justinian respected the rights of patrons, but his indulgence removed the badge of disgrace from the two inferior orders of freedmen; whoever ceased to be a slave, obtained without reserve or delay the station of a citizen; and at length the dignity of an ingenuous birth was created or supposed by the omnipotence of the emperor.”*
The above account of slavery and its modifications will be found in strictest conformity with the Institutes of Justinian. Thus, book 1st, title 3d, it is said: “The first general division of persons in respect to their rights is into freemen and slaves.” The same title, sec. 4th: “ Slaves are born such, or become so. They are born such of bondwomen; they become so either by the law of nations, as by capture*, or by the civil law. Section 5th: “In the condition of slaves there is no diversity; but among free persons there are many. Thus some are ingenui or freemen, others libertini or freedmen.”
Tit. 4th. De Ingenuis. — “A freeman is one who is born free by being born in matrimony, of parents who both are free, or both freed; or of parents one free and thé other freed. . But one born of a free mother, although the father be a slave or unknown, is free.”
Tit. 5th. De Libertinis. — “Freedmen are those who have been manumitted from just servitude.”
Section third of the same .title states that “freedmen were formerly distinguished by a threefold division.” But the emperor proceeds .to say: “Our piety leading us to reduce all things into a better state, we have amended our laws, and reestablished the ancient usage; for anciently liberty was simple and' undivided — that is, was conferred upon the slave as his manumittor possessed it, admitting this single difference, that the person manumitted became only a freed man, although his manumittor was a free man.” And he further declares: “We have made all freed men in general become citizens of Rome, regarding neither the age of the manumitted, nor the manu-mittor, nor the ancient forms of manumission. We have also introduced many new methods by which slaves may become Roman citizens.”
By the references above.given it is shown, from the nature and objects of civil' and political associations, and uporr the direct authority of history, that citizenship was not conferred *480 by the simple fact of emancipation, but that such a result was deduced therefrom in violation of the fundamental principles of free political association; by the exertion of despotic will to establish, under a false and misapplied denomination, one equal and universal slavery; and to effect this result required the exertions of absolute power — of a,power both in theory and practice, being in its most plenary acceptation the sovereignty, the State itsele — it could not be produced by a less or inferior authority, much less by the will or the act of one who, with reference to civil and political rights, was himself a slave. The master might abdicate or abandon his interest or owner-, ship in his property, but his act would be a mere abandonment. It seems to involve an absurdity to impute to it the investiture of rights which the sovereignty alone had power to impart. There is not perhaps a community in which slavery is recognised, in which the power of emancipation and the modes of its exercise are not regulated by law — that is, by thq sovereign authority; and none can fail to comprehend the necessity for such regulation, for the preservation of order, and even of political and social existence.
By the argument for the plaintiff in error, a power equally despotic is.vested in every member of the association, and the most obscure or unworthy individual it comprises may arbitrarily invade and derange its most deliberate and solemn ordinances. At assumptions anomalous ás these, so fraught with mischief and ruin, the mind at once is revolted, and goes directly to the conclusions, that to change or to abolish a fundamental principle of the society, must be the act of the society itself — of the sovereignty; and that none other can admit to a participation of that high attribute. It may further expose the character of the argument urged for the plaintiff, to point out some' of the revolting consequences which it would authorize. If that argument possesses any integrity, it asserts the power in any citizen, or quasi citizen, or a resident'foreigner of any one of the States, from a motive either of corruption or caprice, not only to infract the inherent and necessary authority of such State, but also materially to interfere with the organization of the Federal Government, and with the authority of the separate and independent States. He may emancipate his negro slave, by which process- be first transforms that slave into a eitizén of his own State; he may next, under color of article fourth, section second, of the Constitution of the United States, obtrude him, and on terms of civil and political equality, upon any and every State in this Union, in defiance of all regular tions of necessity or policy, ordained by those States for their internal happiness or safety. Hay, more: this manumitted slave *481 may, by a proceeding springing from the will or act of his master alone, be mixed up with the institutions of the Federal Government, to which he is not a party, and in opposition to the laws of that Government which, in authorizing the exten- „ sion by naturalization of the rights and immunities of citizens of the United States to those not originally parties to the Federal compact, have restricted that boon to free white aliens alone.; If the rights and immunities connected with or practiced un-' der the institutions of the United States can by any indirection be claimed or deduced from sources or modes other than the Constitution and laws of the United States, it follows that the power of naturalization vested in Congress is not exclusive — that it has in effect no existence, but is repealed or abrogated.
But it has been strangely contended that the jurisdiction of the Circuit Court might be maintained upon the ground that the plaintiff was a resident of Missouri, and that, for the purpose of vesting the court with jurisdiction over the parties, residence within the State was sufficient.
The first, and to my mind a conclusive reply to this singular argument is presented in the fact, that the language of the Constitution restricts the jurisdiction of the courts to cases in which the parties shall be citizens, and is entirely silent with respect to residence. A second answer to this strange and latitudinous notion is, that it so far stultifies the sages by whom the Constitution was framed, as to impute to them ignorance of the material distinction existing betweén eitiéenship and mere residence or domicil, and of the well-known facts, that a person confessedly aii alien may be permitted to reside in a? country in which he can possess no civil or political rights,, or of which he is neither a citizen nor subject; and that for certain purposes a man may have a domicil in different countries, in no ojie of which he is an actual personal resident.
The correct conclusions upon the question here'considered would seem to be these:
That in the establishment of the several communities how-the States of this Union, and in the formation of the Federal Government, the African was not deemed politically a person. He was regarded and owned in every State in the Union, as property merely, and as such was not and could not be a party or an actor,, much less a peer in any compact or form of government established by the States or the United States. That if, since the adoption of the State Governments, he has been or could have been elevated to the possession of political rights or powers, this result could have been effected by no authority less potent than that of the sovereignly — the'. State — exert *482 ed to that end,.either in the form of legislation, or in some other mode of operation. It could certainly never have been accomplished by the will of an individual operating independently of the sovereign power, and even contravening and controlling that power. That so far as rights and immunities appertaining to citizens have been defined and- secured by the Constitution and laws of the United States, the African race is not aiid never was recognised either by the language or purposes of the former; and it has been expressly excluded by . every act of Congress providing for the creation of citizens by naturalization, these laws, as has already been remarked, being restricted to free white aliens exclusively.
- But it is evident/that, after the formation of the Federal Government by the adoption of'the Constitution, the highest exertion of State power would be incompetent to bestow a character or status created by the Constitution, or conferred in virtue of its authority only. Upon those, therefore, who were not originally parties to the Federal compact, or who are not admitted and adopted'as parties thereto, in the mode prescribed by its paramount authority, no State could have power to bestow the character or the rights and privileges exclusively-reserved by the States' for the action of the Federal Government by that compact.
The States, in the exercise of their political power, might, with reference to their peculiar Government and jurisdiction, guaranty the rights of person and property, and the enjoyment of civil and political privileges, to those whom they should be disposed to make the objects of their bounty; but they could not reclaim or exert the powers which they had .vested - exclusively in' the Government of the United States. They could not add to or change in any respect the class of (persons' to whom alone the character of citizen of the United States appertained at the time of the adoption.of the Federal (Constitution. They could not create citizens of the United ^States by any direct or indirect proceeding.
According to the view taken of the law, as applicable .to the demurrer to the plea in abatement in this cause,- the questions subsequently raised upon the several pleas, in-bar might be passed by, as requiring neither a particular examination, nor an adjudication directly upon them.- But as-these questions are intrinsically of primary interest and magnitude, and have been elaborately discussed in argument, and as with respect to them the opinions of a majority of the court, including my own, - are perfectly coincident, to me it seems proper that they should here be fully considered, and, so far as it is practicable , for this court to accomplish such an end, finally put to rest. .
*483 The questions tRen to be considered upon the several pleas in bar, and upon the agreed statement of facts between the counsel, are: 1st. "Whether the admitted master and owner of the plaintiff, holding him as his . slave in the State of Missouri, and. in conformity with his rights guarantied to him by ''the laws of Missouri then and still m force,-by carrying with him for his own benefit and accommodation, and as his own slave, the person of the plaintiff into the State of Illinois, within which State slavery had been prohibited by the Constitution thereof, and by retaining the plaintiff during the com-morancy of the master within the State of Illinois, had, upon his return with his slave into the State of Missouri, forfeited his rights as master, by reason of any supposed operation of the prohibitory provision in the Constitution of Illinois, beyond the proper territorial jurisdiction of the latter State? 2d. Whether a similar removal of the plaintiff by his master from the State of Missouri, and his retention in service atapoiht included within no State, but situated north of thirty-six degrees thirty minutes of north latitude, worked a forfeiture of' the right of property of the master, and the manumission of the plaintiff?
. In considering the first of these questions, the acts or declarations of the master, as expressive of his purpose to emancipate, maybe thrown out of view, since none will deny the right of the owner to relinquish his interest in any subject of' property, at any time or in any place. The inquiry here bears no relation to acts or declarations of the owner, as expressive of his intent or purpose to make such a relinquishment; it is simply a question whether, irrespective of such purpose, and in opposition thereto, that relinquishment can be enforced against the owner of property within his own country, in defiance' of every guaranty promised by its laws; and this through the instrumentality of a claim to power entirely foreign and . extraneous with reference' to himself, to the origin and foundation of his title, and to the independent authority of his. country. A conclusive negative answer to such an inquiry is at once supplied, by announcing a few familiar and settled principles and doctrines of public law.
Vattel, in his chapter on the general principles of the laws, of nations, section 15th, tells us, that “nations being free and independent of each other in the same' manner that men are naturally free and independent, the second general law of their society is, that each nation should be left in the péaceable enjoyment of that liberty which she inherits from nature.”
“The natural society of nations,” says this writer, “cannot subsist unless the natural rights of each be respected.” In *484 section 16th he says, “ as a consequence of that, liberty and independence, it exclusively belongs to each nation to form her own judgment of what her conscience prescribes for her — of what it is proper or improper for her to do; and of course it rests solely with her to examine and determine whether she can perform any office for another nation without neglecting the duty she owes to herself. In all cases, therefore, in which a nation has the right of judging what her duty requires, no other nation can compel her'to act in such or such a particular manner, for any attempt at such compulsion would be an infringement on the liberty of nations.” Again, in section 18th, of the same chapter, “ nations composed of men, and considered as so many free persons living together in a state of nature, are naturally equal* and inherit from nature the same obligations and rights. Power or weakness does not produce any difference. A small republic is no less a sovereign state than the most powerful kingdom.”
So, in section 20: “A nation, then, is mistress of her own actions, so long as they do not affect the proper and perfect rights of any other nation — so long as she is only internally bound, and does not lie under any external and perfect obligation. If she makes an ill use of her liberty, she is guilty of a breach of duty; but other .nations are bound to acquiesce in her conduct, since they have no right to dictate to her. Since nations are free, independent, and equal, and since each possesses the right of judging, according to the dictates of her conscience, what conduct she is to pursue, in order to fulfil her duties, the effect of the whole is to produce, at least externally, in the eyes of mankind, a perfect equality of rights between nations, in the administration of their affairs, and m the pursuit of their pretensions, without regard to the intrinsic justice of their , conduct, of which others have no right, to form a definitive judgment.”
Chancellor Kent, in the 1st volume of his Commentaries, lecture 2d, after collating the opinions of Grotius, Heineccius, Vattel, and Rutherford, enunciates the following positions as sanctioned by these and other learned publicists, viz: that “nations are equal in respect to each other, and entitled to claim equal consideration for their rights, whatever may be their relative dimensions or strength, or however greatly they may differ in government, religion, or manners., This perfect equality and entire independence of all distinct States is a fundamental principle of public law. It is a neeessaiy consequence of this equality, that each nation has a right to govern itself as it may think proper, and no one nation is entitled to dictate a form of government or religion, or a course of inter *485 nal policy, to another.” This writer gives some instances of the violation of this great national immunity, and amongst them the constant interference by the ancient Romans, under the pretext of settling disputes between their neighbors, but with the real purpose of reducing those neighbors to bondage; the interference of Russia, Prussia, and Austria, for the dismemberment of Poland; the more recent invasion of Naples by Austria in 1821, and of Spain by the French Government in 1823, under the excuse of suppressing a dangerous spirit of ; internal revolution and reform.
With reference to this right of self-government in independent sovereign States, an opinion has been expressed, which, whilst it concedes this right as inseparable from and as a necessary attribute of sovereignty and independence, asserts nevertheless some implied and paramount authority of a supposed international law, to which this right of self-government must be regarded and exerted as subordinate; and.from which independent and sovereign States can be exempted only by a protest, or by some public and formal rejection of that authority. With all respect for those by 'whom this opinion has been professed, I am constrained to regard it as utterly untenable, as palpably inconsistent, and as presenting in argument a complete felo de se. -
Sovereignty, independence, and a perfect right of self-government, can signify nothing less than a superiority to and an exemption from all claims by any extraneous power, however expressly they may be asserted, and render all attempts to enforce such claims merely attempts at usurpation. Again, could such claims, from extraneous sources be regarded as legitimate, the effort to resist or evade them, by protest or denial, would be as irregular and unmeaning as it would be futile. It could in no wise affect the question of superior right. For the position here combatted, no respectable authority has been, and none it is' thought can be adduced. It is certainly irreconcilable with the doctrines already cited from the writers upon public law.
Neither the case of Lewis Somersett, (Howell’s State Trials, vol. 20,) so often vaunted as the proud evidence of devotion to freedom under a Government which has done as much perhaps to extend the reign - of slavery as all the world besides; nor does any decision founded upon the authority of Somersett'B case, when correctly expounded, assail or impair the principle of national equality enunciated by each and all of the publicists already referred to. In the case of Somersett, although the applicant for the habeas corpus and the individual claiming properly in that applicant were both subjects and residents *486 "within tie British empire, yet the decision cannot be correctly understood as ruling absolutely and under all circumstances .against the right of property in the claimant. That decision goes no farther than to determine, that within the realm of England there was no authority to justify the detention of an individual in private bondage. If the decision in Somersett’s case had gone beyond this point, it would have presented the anomaly of a repeal by laws enacted for and limited in their operation to the realm alone, of other laws and institutions established for places and subjects without the limits of the realm of England; laws and institutions at that very time, and long subsequently, sanctioned and maintained under the authority of the British Govérnment, and which the full and combined action of the King and Parliament was required to abrogate.
But could the decision in Somersett’s case be correctly interpreted as ruling the doctrine which it has been attempted to deduce from it, still that doctrine must be considered as having been overruled by the lucid and able opinion of Lord Stowell in the more recent ease of the slave Grace, reported in the second volume of Haggard, p. 94; in which opinion, whilst it is conceded by the learned judge that there existed no power to coerce the slave whilst in England, that yet, upon her return to the island of Antigua, her status as a slave was revived, or, rather, that the title of the owner to the slave as property had never been extinguished, but had always existed in that island. If the principle of this decision be applicable as between different portions of one and the same empire, with how much more force does it apply as between nations or Governments entirely separate, and absolutely independent of each other? For in this precise attitude the States of this Union stand with reference to this subject, and with reference to the tenure of every description of property vested under their laws and held within their territorial jurisdiction.
A strong illustration of the principle ruled by Lord Stowell, and of the effect of that principle even in a case of express contract, is seen in the case of Lewis v. Fullerton, decided by the Supreme Court of Virginia, and reported in the first volume of Randolph, p. 15. The .case was this: A female slave, the property of a citizen of Virginia, whilst with her master in the State of Ohio, was taken from his possession under a writ of habeas corpus, and set at liberty. Soon, or immediately after, by agreement between this slave and her master, a deed, was executed in Ohio by the latter, containing a stipulation that this slave should return to Virginia, and, after a service of'two years in that State, should there be tree. The law of Virginia *487 regulating emancipation required that deeds of emancipation should, within a given time from their date, be recorded in the court of the county in which the grantor resided, and declared that deeds with regard to which this requisite was not complied with should be void. Lewis, an infant son of this female, under the rules prescribed in such cases, brought an action, in forma pauperis, in one of the courts of Virginia, for thé'recovery of his freedom, claimed in virtue of the transactions above mentioned. Upon an appeal to the Supreme Court' from a judgment against the plaintiff, Roane, Justice, in delivering the opinion of the court, after disposing of other questions discussed in that case, remarks:
“As to the deed-of emancipation contained in the record, that' deed, taken in connection with the evidence offered in support of it, shows that it had a reference to the State of Virginia; and the testimony shows that it formed a part of this contract, whereby the slave Milly was to be brought back (as she was brought back) into the State of Virginia. Her object was therefore to secure her freedom by the deed within the State of Virginia, after the time should have expired for which she had indented herself, and when she should be found abiding within the State of Virginia.
“ If, then, this contract had an eye to the State of Virginia for its operation and effect, the lex loci ceases to .operate. In that case it must, to have its effect, conform to the laws of Virginia. It is insufficient under those laws to effectuate an emancipation, for want of a due recording in the county court, as was decided in the case of Givens v. Mann, in this court. It is also ineffectual within the Commonwealth of Virginia for another reason. The lex loci is also to be taken subject to the exception, that it is not to be enforced in another country, when it violates some moral duty or the policy of that country, or is not consistent with a positive right secured to. a third person or party by the laws of that. country in which it is sought to be enforced. In such a case we are told, lmagis jus nostrum, qmm jus alimam servemus.’” (Huberus, tom. 2, lib. 1, tit. 3; 2 Fontblanque, p. 444.) “ That third party in this instance is the Commonwealth of Virginia, and her policy and interests are also to be attended to. These turn the scale against the lex loci in the present instance.”
The second or last-mentioned position assumed for the plaintiff under the pleas in bar, as it rests mainly if not' solely upon the provision of the act of Congress of March .6, 1820, prohibiting slavery in Upper Louisiana north of thirty-six degrees thirty minutes north latitude, popularly called the Missouri Compromise, that assumption renews the question, formerly so *488 zealously debated, as to the validity of the provision in the act of Congress, and upon tbe constitutional competency- of Congress to establish it.
Before proceeding, however, to examine the validity of the prohibitory provision of the law, it may, so far as the rights involved in this cause are concerned, be remarked, that conceding to that provision the validity of a legitimate exercise of power, still this concession could by no rational interpretation imply the slightest authority for its operation' beyond the territorial limits comprised within its terms; much less could there be inferred from it a power to destroy or in any degree to control rights, either of person or property, entirely within the bounds of a distinct and independent sovereignty — rights invested and fortified by the guaranty of that sovereignty. These surely would remain in all their integrity, whatever effect might be ascribed to the prohibition within the limits defined by its language.
But, beyond and in defiance of this conclusion, inevitable and undeniable as it appears, upon every principle of justice or sound induction, it has heen attempted to convert this prohibitory provision of the act of 1820 not- only into a weapon with which to assail the inherent — the necessarily inherent— powers of independent sovereign Governments, but into a mean of forfeiting that equality of rights and immunities which are the birthright or the donative from the Constitution of every citizen of the .United States within the length and breadth of the nation. In this attempt, there is asserted a power in Congress, whether from incentives of interest, ignorance, faction, partiality, or prejudice, to bestow upon a portion of the citizens of this nation that which is the common property and privilege of all — the power, in fine, of confiscation, in retribution for no offence, or, if for an offence, for that of accidental locality only.
It may be that, with respect to future cases, like the one now before the court, there is felt an assurance of the impotence of such a pretension; still, the fullest conviction of that result can impart to it no claim to forbearance, nor dispense with the duty of antipathy and disgust at its sinister aspect, •whenever it may be seen to scowl upon the justice, the order, the tranquillity, and fraternal feeling, which are the surest, nay, the only means, - of promoting or preserving the happiness and prosperity of the nation, ana which were the great and efficient incentives to the formation of this Government.
The power of Congress to impose the prohibition in the eighth section of the act of 1820 has been advocated upon an attempted construction of the second clause of the third section *489 of the fourth article of the Constitution, which declares that “Congress shall have power to dispose of and to make all needful rules and regulations respecting the territory and other property belonging to the United States.”
In the' discussions in both houses of Congress, at the time of adopting this eighth section of the act of 1820, great weight was given to the peculiar language of this clause, viz: territory and other property belonging to the United States, as going to show that the power of disposing of and regulating, thereby vested in Congress, was restricted to a proprietary interest in the territory or land comprised therein, and did not extend to the personal or’political rights of citizens or settlers, inasmuch as this phrase in the Constitution, “ territory or other property,” identified territory with property, and inasmuch as citizens or ■persons could not be property, and especially were not property . belonging to the United States. And upon every principle of reason or necessity, this power to dispose of and to regulate the territory of the nation could be designed to extend no farther than to its preservation and appropriation to the uses of those to whom it belonged, viz: the nation. Scarcely anything more illogical or extravagant can be imagined than the attempt to deduce from this provision in the Constitution a power to destroy or in any wise to impair the civil and political rights of the citizens of the United States, and much more so the power to establish inequalities amongst those citizens by creating privileges in one class of those citizens, and by the disfranchisement of other portions or classes, by degrading them from the position they previously occupied.
There can exist no rational or natural connection or affinity between a pretension like this and the power vested by the Constitution in Congress with regard to the Territories ; on the contrary, there is an absolute incongruity between them.
But whatever the power vested in Congress, and whatever the precise subject to which that power extended, it is clear that the power related to a subject appertaining to the United States, and one to be disposed of and regulated for the benefit and under the authority of the United States. Congress was made simply the agent or trustee for the United States, and could not, without a breach of trust and a fraud, appropriate the subject of the trust to any other beneficiary or cestui que trust than the United States, or to the people of the United States, upon equal grounds, legal or equitable. Congress could not appropriate that subject to any one class or portion of the people, to the exclusion of others, politically and. constitutionally equals; but every citizen would, if any one *490 could claim it, have the like rights of purchase, settlement, occupation, or any other right, in the national territory.
Nothing can he more conclusive to show the equality of this with every other right in all the citizens of the United States, and the iniquity and absurdity of the pretension to exclude or to disfranchise a portion of them because they are the owners of slaves,' than the fact that the same instrument, which imparts to Congress its very existence and its every function, guaranties to the slaveholder the title to his property, and gives him the right to its reclamation throughout the entire extent of the nation; and, farther, that the only private property which the Constitution has specifically recognised, and has imposed it as a direct obligation both on the States and the Federal Government to protect and enforce, is the property of the master in his slave; no other right of property is placed by the Constitution upon the same high ground, nor shielded by a similar guaranty.
Can there he imputed to the sages and patriots by whom the Constitution was framed, or can there he detected in the text of that Constitution, or in any rational construction or implication deducible therefrom, a contradiction so palpable as would exist between a pledge to the slaveholdér of an equality with his fellow-citizens, and of the formal and solemn assurance for the security and enjoyment of his property, and a warrant given, as it were uno flatu, to another, to rob him of that property, or to subject him to proscription and disfranchisement for possessing or for endeavoring to retain it? The injustice and extravagance necessarily implied in a supposition like this, cannot be rationally imputed to the patriotic or the honest, or to those who were merely sane.
A conclusion in favor of the prohibitory power in Congress, as asserted in the eighth section of the act of 1820, has been attempted, as deducible from°the precedent of the ordinance of the convention of 1787, concerning the cession by Virginia of the territory northwest of the Ohio; the provision in which ordinance, relative to slavery, it has been attempted to impose upon other and subsequently-acquired territory.
The first circumstance which, in the consideration of this provision, impressés itself upon my mind, is its utter futility and want of authority. This court has, in repeated instances, ruled, that whatever may have been the force accorded to this ordinance of 1787 at the period of its enactment, its authority and effect ceased, and yielded to the paramount authority of the Constitution, from the period of the adoption of the latter. Such is the principle ruled in the cases of Pollard’s Lessee v. Hagan, (3 How., 212,) Parmoli v. The First Municipality of *491 New Orleans, (3 How., 589,) Strader v. Graham, (16 How., 82.) But apart from the superior control of the Constitution, ana anterior to the adoption of that instrument, it is obvious that the inhibition in question never had and never could have any legitimate and binding force. "We may seek in vain for any power in the convention, either to require or to accept a condition or restriction upon the cession like that insisted on; a condition inconsistent with, and destructive of, the object of the grant The cession was, as recommended by the old Congress in 1780, made originally and completed in terms to the United States, and for the benefit of the United States, i. e., for the people, all the people, of the United States. The condition subsequently sought to be annexed in 1787, (declared, too, to be perpetual and immutable,) being contradictory tó the terms and destructive of the purposes of the cession, and after the cession was consummated, and the powers of the ceding party terminated, and the rights of the grantees, the people of ike United States, vested, must necessarily, so far, have been ah initio void. "With respect to the power of the convention-to impose this inhibition, it seems to be pertinent in this place to recur to the opinion of one cotemporary with the establishment of the Government, and whose distinguished services in the formation and adoption of our national charter, point him out as the ariifex maximus of our Eederal system^ James Madison, in the year 1819, speaking with reference to the prohibitory power claimed by Congress, then threatening the very existence of the Union, remarks of the language of the second clause of the third section of article fourth of the Constitution, “that it cannot be well extended beyond a power over the territory as property, and the power to make provisions really needful or necessaiy for the government of settlers, until ripe for admission into the Union.”
Again he says, “with respect to what has taken place in the Northwest territory, it may be observed that the ordinance giving it its distinctive character on the' subject of slavehold-ing proceeded from the old Congress, acting with the best intentions, but under a charter which contains no shadow of the authority exercised; and it remains to be decided how far the States formed within that territory, and admitted into the Union, are on a different footing from its other members as to their legislative sovereignty. As to the power of admitting new States into the Eederal compact, the questions offering themselves are, whether Congress can attach conditions, or .the new States concur in conditions, which after admission would abridge or enlarge the constitutional rights of legislation common to other States; whether Congress can, by a compact *492 with a new State, take power either to or from itself, or place the new member above or below the equal rank and rights possessed by the others; whether all such stipulations expressed or implied would not be nullities, and be so pronounced when brought to a practical test. It falls within the scope of your inquiry to state the fact, that there was a proposition in the convention to discriminate between the old and the new States by an article in the Constitution. The proposition, happily, was rejected.- The effect of such a discrimination is sufficiently evident.”*
In support of the ordinance of 1787, there may be adduced the semblance at least of obligation deducible from compact, the form of assent or agreement between the grantor and fran tee; but this form or similitude, as is justly remarked by Ir. Madison, is rendered null by the absence of power or authority in the contracting parties, and by the more intrinsic and essential defect of incompatibility with the rights and avowed purposes, of those parties, and with their relative duties and obligations to others. If, then, with the attendant formalities of assent or compact, the. restrictive power claimed was void as to the immediate subject of the ordinance, how much more unfounded must be the pretension to such a power as derived from that source, (viz: the ordinance.of 1787,) with respect to territory acquired by purchase or' conquest under the supreme authority of the Constitution — territory not the subject of mere donation, but obtained in the name of all, by the combined efforts and resources of all, and with no condition annexed or pretended. -
In conclusion, my opinion is, that the decision of the Circuit Court, upon the law arising upon the several pleas in bar, is correct, but that it is erroneous in having sustained the dé-murrer to the plea in abatement of the jurisdiction; that for this error the decision of the Circuit Court should be reversed, and the cause remanded to that court, with instructions to abate the action, for the reason set forth and pleaded in the plea in abatement.
In the aforegoing examination of this cause, the circumstance that the questions involved therein had been previously adjudged between these parties by the court of the State of Missouri, has not been adverted to; for although it has been ruled1 by this court, that in instances of concurrent jurisdiction, the court first obtaining possession or cognizance of the control versy should retain and decide it, yet, as in this case there had *493 been no plea, either of a former judgment or of autre aetion pendent, it was thought that the fact of a prior decision, however conclusive it might have been if regularly pleaded, could not be incidentally taken into view.

 Vide Gibbons’s Decline and Fall of the Roman Empire. London edition of 1825, vol. 3d, chap. 44, p. 183.

 Letter from James Madison to Robert Walsh, November 27th, 1819, on the.sob-ject of the Missouri Compromise.